**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| MAIN PAINT & BODY, INC. | ) |
| | ) |
| On behalf of itself and all others similarly situated, | ) Case No. |
| | ) Judge |
| Plaintiffs, | ) |
| | ) **COMPLAINT** |
| v. | ) (With Jury Demand) |
| | ) |
| STATE FARM MUTUAL AUTOMOBILE INS. CO. | ) |
| | ) |
| STATE FARM FIRE AND CASUALTY CO. | ) |
| | ) |
| ALLSTATE FIRE & CASUALTY INS. CO. | ) |
| | ) |
| ALLSTATE INSURANCE CO. | ) |
| | ) |
| ALLSTATE PROPERTY & CASUALTY INS. CO. | ) |
| | ) |
| ESURANCE PROPERTY & CASUALTY INS. CO. | ) |
| | ) |
| NORTHBROOK INDEMNITY COMPANY | ) |
| | ) |
| ENCOMPASS HOME & AUTO INS. CO. | ) |
| | ) |
| ALLSTATE INDEMNITY CO. | ) |
| | ) |
| ENCOMPASS INSURANCE CO. OF AMERICA | ) |
| | ) |
| ENCOMPASS INDEMNITY CO. | ) |
| | ) |

ESURANCE INSURANCE CO. )
)
GEICO CASUALTY CO. )
)
GEICO GENERAL INSURANCE CO. )
)
GEICO INDEMNITY CO. )
)
GOVERNMENT EMPLOYEES )
INSURANCE CO. )
)
UNITED STATES LIABILITY INSURANCE )
CO. )
)
GRANGE MUTUAL CASUALTY )
COMPANY )
)
GRANGE PROPERTY AND CASUALTY )
INS. CO. )
)
TRUSTGARD INS. CO. )
)
GRANGE INDEMNITY INS. CO. )
)
SAFECO INSURANCE CO. OF IL )
)
LIBERTY MUTUAL FIRE INSURANCE CO. )
)
LM GENERAL INSURANCE CORP. )
)
WEST AMERICAN INSURNACE CO. )
)
LM INSURANCE CO. )
)
PEERLESS INDEMNITY INSURANCE CO. )
)
THE FIRST LIBERTY INSURANCE CORP. )
)
MID AMERICAN FIRE & CASUALTY )
INSURANCE CO. )
)
AMERICAN FIRE & CASUALTY CO. )
)
LIBERTY INSURANCE CO. )
)
OHIO CASUALTY INSURANCE CO. )

| | |
|---|---|
| OHIO SECURITY INSURANCE CO. | ) |
| | ) |
| SAFECO INSURANCE CO. OF AMERICA | ) |
| | ) |
| AMERICAN FAMILY INS. CO. | ) |
| | ) |
| THE GENERAL AUTOMOBILE INS. CO., INC. | ) |
| | ) |
| AMERICAN STANDARD INS. CO. OF OHIO | ) |
| | ) |
| PERMANENT GENERAL ASSURANCE CORP. OF OHIO | ) |
| | ) |
| PERMANENT GENERAL ASSURANCE CORP. | ) |
| | ) |
| AMERICAN FAMILY MUTUAL INS. CO. | ) |
| | ) |
| ERIE INSURANCE CO. | ) |
| | ) |
| WESTFIELD NATIONAL INS. CO. | ) |
| | ) |
| WESTFIELD INS. CO. | ) |
| | ) |
| AMERICAN SELECT INS. CO. | ) |

Plaintiff Main Paint & Body, Inc., on behalf of itself and the class of all others similarly situated as defined below, for their Complaint against the Defendants State Farm insurance group, Allstate insurance group, GEICO insurance group, Grange Mutual insurance group, Liberty Mutual insurance group, American Family insurance group, Erie Insurance Co. and Westfield insurance group, as identified more specifically below, alleges as follows based on personal knowledge, investigation of counsel, and information and belief:

## SUMMARY OF ACTION

1.      This case seeks damages and other relief under the Sherman Act, 15 U.S.C. § 1- 7 and Ohio's Corrupt Activities Act, Ohio Rev. Code 2923.31-36 to remedy the Defendants' unlawful conspiracy to suppress compensation to repair facilities for automotive collision repairs covered by insurance.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367(a), as the Plaintiff asserts a cause of action arising under the laws of the United States, and state law causes of action which are part of the same case or controversy.

3.      The Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2), as the case is brought as a class action under Fed. R. Civ. P. 23, the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and because there is diversity of citizenship between members of the putative class and certain of the defendants.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c) and (d) because Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity and events alleged below that affected interstate trade and commerce occurred in this District.

## PARTIES

5.      Plaintiff  Main Paint & Body, Inc. is an Ohio corporation which maintains its principal place of business in Ohio. Main Paint & Body was and is engaged in the business of automotive collision repair, and at all relevant times was injured, and continues to be injured, as a result of the Defendants' unlawful conduct.

## STATE FARM GROUP

6.      Defendant State Farm Mutual Automobile Insurance Company is an Illinois corporation with its principal place of business in Illinois.

7.      Defendant State Farm Fire and Casualty Company is likewise an Illinois corporation with its principal place of business in Illinois.

8.      These companies, collectively referred to as "State Farm," issue automotive collision insurance throughout the State of Ohio, and operate as a single, integrated enterprise for claims adjustment and administrative purposes, including, without limitation, the conduct and subject matter at issue in this action.

9.      The State Farm companies collectively control approximately 19% of the market for automobile collision insurance in Ohio.

## ALLSTATE GROUP

10.     Defendants Allstate Fire and Casualty Ins. Co., Allstate Insurance Co., Allstate Property and Casualty Ins. Co. and Allstate Indemnity Co. are all Illinois corporations with their principal places of business in Illinois.

11.     Defendant Esurance Property and Casualty Ins. Co. is a California corporation with its principal place of business in California.

12.     Defendant Esurance Ins. Co. is a Wisconsin corporation with its principal place of business in California.

13.     Defendant Northbrook Indemnity Co. is al Illinois corporation with its principal place of business in Illinois.

14    Defendants Encompass Home and Auto Ins. Co., Encompass Ins. Co. of America and Encompass Indemnity Co. are all Illinois corporations with a principal place of business in Illinois.

15.    These companies, collectively referred to as "Allstate," issue automotive collision insurance throughout the State of Ohio, and operate as a single, integrated enterprise for claims adjustment and administrative purposes, including, without limitation, the conduct and subject matter at issue in this action.

16.    The Allstate companies collectively control approximately 10% of the market for automobile collision insurance in Ohio.

GEICO GROUP

17.    Defendants GEICO Casualty Co., GEICO General Ins. Co., GEICO Indemnity Co., and Government Employees Ins. Co.  are all Maryland corporations with their principal places of business in the District of Columbia.

18.    Defendant United States Liability Ins. Co. is a Pennsylvania corporation with its principal place of business in Pennsylvania.

19.    These companies, collectively referred to as "GEICO," issue automotive collision insurance throughout the State of Ohio, and operate as a single, integrated enterprise for claims adjustment and administrative purposes, including, without limitation, the conduct and subject matter at issue in this action.

20.    The GEICO companies collectively control approximately 5-6% of the market for automobile collision insurance in Ohio.

## GRANGE GROUP

21.     Defendant Grange Mutual Casualty Co., Grange Property and Casualty Ins. Co., Grange Indemnity Ins. Co. and Trustgard Ins. Co. are all Ohio corporations with their principal places of business in Ohio.

22.     These companies, collectively referred to as "Grange," issue automotive collision insurance throughout the State of Ohio, and operate as a single, integrated enterprise for claims adjustment and administrative purposes, including, without limitation, the conduct and subject matter at issue in this action.

23.     The Grange companies collectively control approximately 5% of the market for automobile collision insurance in Ohio.

## LIBERTY MUTUAL GROUP

24.     Defendant Safeco Insurance Co. of Illinois is Illinois corporation with its principal place of business in Massachusetts.

25.     Defendant Safeco Insurance Co. of America is a New Hampshire corporation with its principal place of business in Massachusetts.

26.     Defendant Liberty Mutual Fire Insurance Co. is a Wisconsin corporation with its principal place of business in Massachusetts.

27.     Defendant LM General Insurance Co. and LM Insurance Co. are Illinois corporations with their principal places of business in Massachusetts.

28.     Defendant West American Ins. Co. is an Indiana corporation with its principal place of business in Massachusetts.

29.     Defendant Peerless Indemnity Ins. Co. and First Liberty Ins. Corp. are Illinois corporations with their principal places of business in Massachusetts.

30.　　Defendants Mid-American Fire & Casualty, American Fire & Casualty Co., Ohio Casualty Ins. Co. and Ohio Security Ins. Co. are New Hampshire corporations with their principal places of business in Massachusetts.

31.　　These companies, collectively referred to as "Liberty Mutual," issue automotive collision insurance throughout the State of Ohio, and operate as a single, integrated enterprise for claims adjustment and administrative purposes, including, without limitation, the conduct and subject matter at issue in this action.

32.　　These Liberty Mutual companies collectively control approximately 4% of the market for automobile collision insurance in Ohio.

AMERICAN FAMILY GROUP

33.　　Defendant American Family Ins. Co. is an Ohio corporation with its principal place of business in Wisconsin.

34.　　Defendant American Family Mutual Ins. Co. is a Wisconsin corporation with its principal place of business in Wisconsin.  Defendant General Automobile Sin. Co. Inc. is an Ohio corporation with its principal place of business in Tennessee.

35.　　Defendant American Standard Ins. co. of Ohio is an Ohio corporation with its principal place of business in Wisconsin.

36.　　Defendants Permanent General Assurance Corp. of Ohio and Permanent General Assurance Corp. are Ohio corporations with their principal places of business in Tennessee. These companies, collectively referred to as "American Family," issue automotive collision insurance throughout the State of Ohio, and operate as a single, integrated enterprise for claims adjustment and administrative purposes, including, without limitation, the conduct and subject matter at issue in this action.

37.     The American Family companies collectively control approximately 3% of the market for automobile collision insurance in Ohio.

## ERIE GROUP

38.     Defendant Erie Insurance Co. is a Pennsylvania corporation with its principal place of business in Pennsylvania.

39.     Erie Insurance issues automotive collision insurance throughout the State of Ohio, and controls approximately 3% of the market for automobile collision insurance in the state.

## WESTFIELD GROUP

40.     Defendants Westfield National Ins. Co., Westfield Ins. Co. and American Select Ins. Co. are Oho corporations with their principal places of business located in Ohio.

41.     These companies, collectively referred to as "Westfield," issue automotive collision insurance throughout the State of Ohio, and operate as a single, integrated enterprise for claims adjustment and administrative purposes, including, without limitation, the conduct and subject matter at issue in this action.

42.     The Westfield companies collectively control approximately 3% of the market for automobile collision insurance in Ohio.

## CONSPIRATORS

43.     Entities other than Defendant insurers, including other insurance companies, which are not named as defendants in this action, also participated as conspirators with Defendants.

## ALLEGATIONS

44.     Approximately 85% of automobile collision repairs are covered by insurance.[1] The Defendant insurance groups, in turn, comprise more than 52% of the market for automobile collision insurance in the State of Ohio.  The insurers seek to control all aspects of collision repairs, including purporting to establish the industry standards for compensation to repair facilities, to drive this compensation to the lowest possible level.

45.     To suppress compensation, Defendant insurers and conspirator insurers have all established and enforced an artificial market value for collision repairs, known in the industry as the "prevailing rate," which, as a practical matter, dictates the compensation paid to repair facilities for labor, the costs incurred for paint, parts and materials used in repairs, and the time, scope and extent of compensable repair procedures.  These so-called prevailing rates, however, are lower than market rates for repairs would have been, and would be, in a market free from fraud, deception, coercion and artificial restraint.

46.     There are four major components to repair compensation, each of which has been suppressed by virtue of the Defendant insurers' misconduct:  (i) "Labor" is an hourly rate paid for performing repair and refinishing procedures on the vehicle.  (ii) "Paint and materials," is reimbursement for the costs incurred by repair facilities for the paint and related materials necessary to refinish the vehicle.  Insurers insist on utilizing an hourly rate to compensate repair facilities for "paint and materials," even though these are material, rather than labor costs.  (iii) "Parts" are the parts used by the repair facilities in performing the repairs on the vehicle, which can be either original equipment manufacturer ("OEM") parts, or used or aftermarket parts.  (iv)

---

[1] http://www.edmunds.com/car-care/confessions-from-the-auto-body-shop.html.

The time, scope and extent of repair procedures necessary to restore the vehicle to pre-loss condition.

47.     One way in which the Defendant insurers manipulate the rates for repairs is through the use of estimating databases, promulgated by only three putatively "independent" companies – Audatex, CCC and Mitchell – which are conspirators in this action.  The Defendant insurers will not acknowledge estimates for collision repairs that are not generated from one of the three database companies.  Through the use of these database programs, and in the course of performing various acts of subrogation, the Defendant insurers share information among themselves about the nature and extent of each insurer's practices for compensating repairers.

48.     For purposes of the matters alleged herein, the database companies serve two functions in the collision repair industry.  They sell the estimating programs, and serve as an information storehouse for the collision repair industry.

49.     All insured collision repairs require a repair estimate, which appraises the damage to the vehicle, serves as the blueprint for the repairs to be performed, and establishes the scope and extent of the repairs based on labor procedures and parts, as well as the time to perform the repairs – all of which dictates and determines the cost of repairs.  All insured repair estimates are prepared using an estimating program from one of the three database companies, and these programs are used by both insurers and repair facilities.

50.     The database companies therefore serve two masters: the Defendant insurers, which are responsible for the majority of their revenue, and the repair facilities, which must use the estimating programs to perform their work because the estimates are the only means by which insured repairs are paid.  With respect to the insurance industry, the programs are marketed by the database companies as controlling costs and purportedly improving accuracy.

But with respect to the repair facilities, the purported goal is preparing comprehensive estimates that capture as much revenue as possible.

51.     In reality, the database companies provide the Defendant insurers with the mechanism and tools to suppress compensation to repair facilities.  The database companies' estimating programs consistently:

- designate times to perform repair procedures that are understated,

- bundle required repair procedures to significantly understate the time necessary to perform the procedures in a professional and competent manner,

- impose formulas for calculating times for repair procedures that are arbitrary and understated, which do not reflect the labor time necessary to perform the procedures in a professional and competent manner, and

- collapse and combine repair procedures to achieve what is known as "overlap" or "redundancy," in order to reduce the time, and cost, in repair estimates.

52.     Further, the database companies have written their programs so that any time a repair estimate contains additional or supplemental repair procedures that are required in the judgment and discretion of the repair professional, or deviates in some way from any of the designated labor times, those entries are highlighted for audit by the Defendant insurers, enabling them to avoid appropriately compensating repair facilities for work that the insurers contend is subsumed by the bundled procedures, or because the purported "prevailing standard" in the industry is not to charge for these necessary added procedures or enhancements in time.

53.     The database companies also provide Defendant insurers with so-called "scrubber" programs, which audit repair programs from repair facilities to likewise avoid appropriately compensating them for repair procedures or costs that do not comport with what

Defendant insurers contend are the "industry prevailing rates and standards" for repair, and Defendant insurers refuse to pay for repairs other than at the so-called "industry prevailing rates and standards."

54.     In addition to selling the estimating programs, the database companies collect and manipulate repair data from the insurers that use its estimating program, and these data are then furnished to the respective Defendant insurers for all insured repairs covered by that particular insurer, and for all insured repairs in the aggregate covered by the other insurers utilizing that data provider's estimating program.

55.     This repair data, however, is heavily biased because it is predicated on repairs by the insurers direct repair facilities ("DRPs"), which, by contract, are required to accept payment rates and parameters set by Defendant insurers.  Thus, although these data are promulgated as representative of industry prevailing rate, they are in fact a feedback loop of the fixed rates that the insurers set with their direct repair facilities, which have been "laundered" through the so-called independent database companies.

56.     Through the subrogation departments of Defendant insurers and Conspirator insurers, each knows in full detail what the other insurers are paying to repair facilities – both DRP and non-DRP – for insured repairs. In addition, each insurer is privy to repair estimates underlying insured claim repairs paid by other insurers. In this way, the Defendant insurers and Conspirator insurers all know what other insurers are paying in labor rates and reimbursement for "paint and materials" (as well as costs for parts and discounts provided by repair facilities on parts and compensation for certain repair procedures). Further, Defendant insurers and Conspirator insurers also know which estimating program is utilized by each insurer, as well as

the insurer's estimating profile – or, at the very least, the parameters of the estimates that each insurer writes and pays as the "prevailing rate."

57.     The foregoing information is all available to Defendant insurers and Conspirator insurers on a current basis, as claims settlement occurs through the subrogation process. Moreover, upon information and belief, Defendant insurers and Conspirator insurers all utilize the subrogation data to analyze their repair costs in order to predict and construct future pricing parameters.  This information is also freely exchanged at conferences which are attended by industry stakeholders, including Defendant insurers and Conspirator insurers, manufacturers, and vendors like LKQ (the largest aftermarket parts manufacturer and distributor).

58.     At these conferences there are seminars, presentations and open discussions concerning, among other things, repair estimating methodologies, repair protocols and cost containment, including past and current pricing data, as well as future trends and implementation of cost-savings measures.

59.     Upon information and belief, additional discussions about these subjects occur between and among Defendant insurers and Conspirator insurers – and their business partners – at these conferences. Upon information and belief, personnel for Defendant insurers and the database companies often move between the two.  For example, Audatex presently employs former officer and executive level personnel from Defendant Insurers, including State Farm and Allstate, in advisory and consulting positions.

60.     As a result of all of the foregoing, Defendant insurers and Conspirator insurers, which comprise more than half of the auto insurance market in Ohio and account for and control approximately a like amount of the market for insured collision repairs, are able to fix and maintain prevailing rates for hourly labor rates and "paint and materials" reimbursement across

the country, including in Ohio, and repair facilities (in the state) are essentially paid the same or nearly the same rates. In this way, repair compensation to Plaintiff and the Class has been – and remains –artificially suppressed.

61.     The Defendant insurers further suppress and manipulate labor rates and repair rates for various procedures by disguising departures from the purported "prevailing rates" in a line-item concession or adjustment.  The Defendant insurers all began this practice in Ohio at approximately the same time, in or around 2008, which was not and could not have been coincidental.

62.     In sum, the database companies are not independent authorities on collision repair standards and costs, but instead, are beholden to the Defendant insurers, offering themselves as useful tools enabling the Defendant insurers to suppress compensation to the repair facilities.

63.     Armed with the rigged industry repair data, which is shared or exchanged between and among Defendant insurers, and the estimating programs that work decidedly to their advantage, Defendant insurers can and do misrepresent to Plaintiffs and prospective class members that deviations in hourly labor rates, reimbursement for "paint and materials," the time, scope and extent of compensable repair procedures, or  parts prices do not constitute the "prevailing rates" in the industry and that no other repair facilities charge those rates or for those repair procedures.

64.     The Defendant insurers and Conspirator insurers pressure Plaintiff and members of the class to accept these artificially low rates, quite simply, by threatening to steer and/or steering, customers to other collision repair facilities.   As a consequence, Plaintiff and the prospective class members have been injured by being forced to accept below market compensation for their services.

## CLASS ACTION ALLEGATIONS

65.     Plaintiffs bring this action on behalf of itself and all other similarly situated members of the class pursuant to Rule 23(a), (b)(3) and (c)(4) of the Federal Rules of Civil Procedure, and seeks certification of the following Class:

> All collision repair facilities in Ohio which, at any time during the period from November 1, 2009 through the date that class notice is disseminated: (i) have performed automotive collision repair work or services on or in connection with a vehicle insured by, or covered under insurance issued by, any Defendant; (ii) were not at the time of such work on a direct repair program of such insurer; and (iii) were compensated for labor, "paint and materials," parts, or the time, scope and extent of repair procedures based on the insurer's, prevailing, competitive or industry rate.

66.     Excluded from the Class are Defendants and conspirators, their officers, directors, management, employees, subsidiaries and affiliates.

67.     Questions of law and fact common to the Classes include, without limitation:

a. whether Defendant insurers, respectively, engaged in deceptive schemes to establish artificially low prevailing rates, and misrepresent and conceal material facts about the prevailing rates for: (i) labor; (ii) "paint and materials" reimbursement"; (iii) parts prices; and/or (iv) the time, scope and extent of compensable repair procedures;

b. whether Defendant insurers, respectively, engaged in deceptive schemes to suppress compensation to repair facilities, including: (i) labor rates; (ii) "paint and materials" reimbursement"; (iii) parts prices; and/or (iv) the time, scope and extent of compensable repair procedures;

c. whether Defendant insurers, respectively, prepared repair estimates and repair estimate supplements using their respective estimating profiles with CCC, Audatex and/or Mitchell and company estimating protocols, which constrained the time, scope and extent of compensable

repair procedures, hourly labor rates, reimbursement for "paint and materials" and/or parts prices;

d. whether Defendant insurers, respectively, used scrubber programs from CCC, Audatex and/or Mitchell – or any independent audit program such as Performance Gateway – to review repair estimates and repair estimate supplements to constrain the time, scope and extent of compensable repair procedures, hourly labor rates, reimbursement for "paint and materials" and/or parts prices;

e. whether Defendant insurers, respectively, entered into agreements with DRP facilities to establish and maintain prevailing rates for the purpose of, and/or which had the effect of, suppressing compensation for the time, scope and extent of compensable repair procedures, hourly labor rates, reimbursement for "paint and materials" and/or parts prices;

f. whether Defendant insurers, respectively, coerced or forced the members of the Class to accept suppressed compensation for insured collision repairs under threat that they would not be able to perform insured collision repairs presently or in the future, or if they wanted to do business with Defendant Insurers;

g. whether Defendant insurers, respectively, steered or withheld business as part of their unlawful pattern and practice of conduct;

h. whether, as a result of conduct of the respective Defendant insurers, the CCC, Mitchell and/or Audatex estimating programs are impacted, influenced or tainted by: (i) time studies supporting designated labor times that are outdated, incomplete or improperly extrapolated to procedures involving unrelated vehicles, parts and equipment; (ii) re-worked time studies enabling the Information providers to report results that are satisfactory to insurers (i.e., results which reduce the labor times designated for repair procedures); (iii) bundling numerous repair

procedures and tasks to significantly understate the labor time necessary to perform the procedures in a professional and competent manner; (iv) imposing formulas for calculating labor times for procedures that are arbitrary and understated, which do not reflect the labor time necessary to perform the procedures in a professional and competent manner; (v) collapsing and combining procedures to achieve greater overlap to reduce labor times and costs in repair estimates; and/or (vi) shifting necessary repair procedures to "Not Included" or discretionary categories, enabling insurers to avoid compensating repair facilities for their work as unnecessary or not competitive

i. whether Defendant insurers, respectively, engaged in wire fraud, extortion, tampering with records, telecommunications fraud and/or insurance fraud and;

j. whether Defendant insurers, respectively, engaged in a pattern of corrupt activities;

k. whether, as a result of Defendant insurers' respective unlawful conduct, Plaintiff and the Class received less in compensation for collision repair services for: (i) labor rates; (ii) "paint and materials" reimbursement"; (iii) parts prices; and/or (iv) the time, scope and extent of compensable repair procedures.

68. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and the members of the Class were damaged by, and as a result of, the same wrongful conduct by Defendant insurers, *i.e.,* they received less in compensation for insured collision repair services.

69. Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are aligned with, and not antagonistic to, those of the Class.

70. Plaintiff are represented by counsel who are experienced and competent in the prosecution of class action litigation, and have particular experience with class action RICO litigation.

71.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Among other things, class treatment will permit a large number of similarly situated entities and persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

72.     Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## COUNT ONE
## (VIOLATION OF THE SHERMAN ACT – PRICE FIXING)

73.     Plaintiff incorporates by reference all the foregoing allegations in the Complaint.

74.     The Sherman Act, 15 U.S.C. §1, prohibits contracts, combinations or conspiracies in restraint of trade.  Such agreements are illegal if their purpose or effect is to create an unreasonable restraint of trade or if they constitute a per se violation of the statute.

75.     Through parallel actions and explicit agreement, the Defendants have conspired and combined, as buyer-side participants in the market for collision repair in Ohio, to impose maximum price limits on the Plaintiffs for their products and services.

76.     Such concerted conduct by Defendants unreasonably restrains trade and artificially depresses the market for collision repair services and products, causing substantial damage to the plaintiff and the class it seeks to represent.

77.     Such concerted conduct by Defendants has a substantial effect on interstate commerce.

78.     As a proximate result of the Defendants' statutory unlawful conduct and conspiracy, Plaintiff has been injured by receiving less in compensation for collision repairs than it would have in a market free from fraud, illegality and collusion.

## COUNT TWO
## (VIOLATION OF OHIO CORRUPT ACTIVITIES ACT)

79.     Plaintiff incorporates by reference all the foregoing allegations in the Complaint.

80.     Under Ohio R.C. 2923.32(A)(1), no person "employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity…"

81.     Pursuant to Ohio R.C. 2923.31(I)(1), (2)(a) and (2)(c), corrupt activity includes conduct that violates 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1951 (obstructing or delaying commerce by extortion), Ohio R.C. 2913.05 (telecommunications fraud), R.C. 2913.42 (tampering with records) and R.C. 2913.47 (insurance fraud).

82.     The federal wire-fraud statute, 18 U.S.C. § 1343, prohibits any person who, having devised a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire communication in interstate commerce any writings, signs or signals for the purpose of executing such scheme or artifice.

83.     The federal extortion statute, 18 U.S.C. § 1951, makes it unlawful for any person to in any way or degree obstruct or affect commerce through extortion, which is defined as obtaining property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear.

84.     Ohio R.C. 2913.05 similarly provides that "No person, having devised a scheme to defraud, shall knowingly disseminate, transmit, or cause to be disseminated or transmitted by

means of a wire, radio, satellite, telecommunication, telecommunications device, or telecommunications service any writing, data, sign, signal, picture, sound, or image with purpose to execute or otherwise further the scheme to defraud."

85. Under Ohio R.C. 2913.42, "(A) No person, knowing the person has no privilege to do so, and with purpose to defraud or knowing that the person is facilitating a fraud, shall do any of the following: (1) Falsify, destroy, remove, conceal, alter, deface, or mutilate any writing, computer software, data, or record…"

86. Insurance fraud in Ohio, as defined by Ohio R.C. 2913.47, is committed by anyone who, "with purpose to defraud or knowing that the person is facilitating a fraud, shall do either of the following: (1) Present to, or cause to be presented to, an insurer any written or oral statement that is part of, or in support of … a claim for payment pursuant to a policy, or a claim for any other benefit pursuant to a policy, knowing that the statement, or any part of the statement, is false or deceptive; (2) Assist, aid, abet, solicit, procure, or conspire with another to prepare or make any written or oral statement that is intended to be presented to an insurer as part of, or in support of … a claim for payment pursuant to a policy, or a claim for any other benefit pursuant to a policy, knowing that the statement, or any part of the statement, is false or deceptive."

87. Each Defendant is a person as defined in Ohio R.C. 2923.31(G), and collectively have formed and operate as an association-in-fact enterprise as defined in Ohio R.C. 2923.31(C).

88. Each Defendant, and each group of Defendants, was associated with the enterprise.

89. The Defendant insurers and Conspirators have knowingly and repeatedly violated each of these statutes in the course of performing the activities and conducting business in the

manner described above. They have conducted or participated in the affairs of the enterprise through this pattern of corrupt activity.

90.     As a proximate result of the corrupt activity committed by the Defendants, Plaintiff and the proposed class have suffered and will continue to suffer injury.

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for the following relief:

A.     Certification of the case as a class action defined herein pursuant to Fed. R. Civ. P. 23(a) and (b)(3) and designate Plaintiff as the representative of the Class and its counsel as Class Counsel;

B.     Certify the case as a class action pursuant to Fed. R. Civ. P. 23(c)(4) as to the following issues:

(a)  whether Defendant insurers, respectively, engaged in deceptive schemes to establish artificially low prevailing rates, and misrepresent and conceal material facts about the prevailing rates for: (i) labor; (ii) "paint and materials" reimbursement"; (iii) parts prices; and/or (iv) the time, scope and extent of compensable repair procedures;

(b)     whether Defendant insurers, respectively, engaged in deceptive schemes to suppress compensation to repair facilities, including: (i) labor rates; (ii) "paint and materials" reimbursement"; (iii) parts prices; and/or (iv) the time, scope and extent of compensable repair procedures;

(c)     whether Defendant insurers, respectively, prepared repair estimates and repair estimate supplements using their respective estimating profiles with CCC, Audatex and/or Mitchell and company estimating protocols, which constrained the time, scope and extent of compensable repair procedures, hourly labor rates, reimbursement for "paint and materials" and/or parts prices;

(d)     whether Defendant insurers, respectively, used scrubber programs from CCC, Audatex and/or Mitchell – or any independent audit program such as Performance Gateway – to review repair estimates and repair estimate supplements to constrain the time, scope and extent of compensable repair

procedures, hourly labor rates, reimbursement for "paint and materials" and/or parts prices;

(e)     whether Defendant insurers, respectively, entered into agreements with DRP facilities to establish and maintain prevailing rates for the purpose of, and/or which had the effect of, suppressing compensation for the time, scope and extent of compensable repair procedures, hourly labor rates, reimbursement for "paint and materials" and/or parts prices;

(f)     whether, as a result of conduct of the respective Defendant insurers, the CCC, Mitchell and/or Audatex estimating programs are impacted, influenced or tainted by: (i) time studies supporting designated labor times that are outdated, incomplete or improperly extrapolated to procedures involving unrelated vehicles, parts and equipment; (ii) re-worked time studies enabling the Information providers to report results that are satisfactory to insurers (i.e., results which reduce the labor times designated for repair procedures); (iii) bundling numerous repair procedures and tasks to significantly understate the labor time necessary to perform the procedures in a professional and competent manner; (iv) imposing formulas for calculating labor times for procedures that are arbitrary and understated, which do not reflect the labor time necessary to perform the procedures in a professional and competent manner; (v) collapsing and combining procedures to achieve greater overlap to reduce labor times and costs in repair estimates; and/or (vi) shifting necessary repair procedures to "Not Included" or discretionary categories, enabling insurers to avoid compensating repair facilities for their work as unnecessary or not competitive;

(g)     whether Defendant insurers, respectively, engaged in wire fraud, extortion, tampering with records, telecommunications fraud and/or insurance fraud and;

(h)     whether Defendant insurers, respectively, engaged in a pattern of corrupt activities.

C.     Enter judgment against each of the Defendants and in favor of Plaintiff and the Class on Count One;

D.     Enter judgment against each of the Defendants and in favor of Plaintiff and the Class on Count Two;

E.  Award Plaintiff and the Class damages, including exemplary or punitive damages, in amounts to determined at trial;

F.  Award Plaintiff and the Class their costs of suit, including reasonable attorney fees, as provided by law;

G.  Award Plaintiff and the Class prejudgment and post-judgment interest as provided by law;

H.  Award Plaintiff and the Class any further relief, in law or equity, to which it or they may be entitled.

/s/ Joshua R. Cohen

Erica L. Eversman (0061909)
846 N. Cleveland-Massillon Road
Bath, OH 44333-2181
Telephone: (330) 668-2595
Facsimile: (330) 668-2627
Email: eeversman@vehicleinfo.com

Joshua R. Cohen (0032368)
James B. Rosenthal (0062872)
Jason R. Bristol (0072989)
**COHEN ROSENTHAL & KRAMER LLP**
The Hoyt Block Building - Suite 400
700 West St. Clair Ave.
Cleveland, Ohio 44113
Telephone: (216) 781-7956
Facsimile: (216) 781-8061
E-mail: jcohen@crklaw.com

Dennis A. Becker (0005511)
BECKER & CADE
526 Wards Corner Road, Suite A
Loveland, OH 45140-9134
Telephone: (513) 683-2252
Facsimile: (513) 683-2257
Email: dabecker@fuse.net

Peter D. Traska (0079036)
Traska Law Firm, LLC
P.O. Box 609306
Cleveland, OH 44109
Telephone: 216-282-4738
Facsimile: 216-342-7078
ptraska@traskalawfirm.com

## JURY DEMAND

Plaintiff demands a trial by the maximum number of jurors permissible on all eligible claims and issues.

Joshua R. Cohen
/s/ Joshua R. Cohen